

FILED
MAR 16 2015

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LYNN R. BROADBENT, | * | CIV 13-4081-LLP |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | ORDER ON MOTION FOR |
| | * | ATTORNEY'S FEES |
| THE CITIGROUP LONG TERM | * | |
| DISABILITY PLAN, | * | |
| | * | |
| Defendant. | | |

Plaintiff Lynn Broadbent (Broadbent) moved for an award of attorney's fees and costs incurred in her action for benefits against the Citigroup Long Term Disability Plan (the Plan). Doc. 31. The Plan opposed Broadbent's motion, arguing that she is not entitled to attorney's fees and that even if she is, her request is excessive. Doc. 32. For the reasons explained below, the Court grants Broadbent's motion in part.

I.   **Facts**

Citigroup offers employees long-term disability insurance through the Plan. Metropolitan Life Insurance Company (MetLife) is the Plan's insurer and claims fiduciary and has discretionary authority to construe the terms of the Plan and make eligibility determinations. Doc. 14 at 2; Doc. 33-1 at 4. To receive long-term disability benefits under the Plan, participants must satisfy the Plan's definition of disability. Doc. 31-2 at 2.[1]

---

[1] In a letter to Broadbent, MetLife explained the Plan's definition of disability as follows:
> If you are a member of Class II, "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis, and
> 1. During the Elimination Period you are Totally Disabled; "Totally

Broadbent was a treasury analyst at Citigroup until 2009 when she began experiencing serious health problems. Doc. 31-2 at 9; Doc. 14 at 1–2. In October 2009, David Hoversten, Broadbent's treating orthopedist, submitted a letter to MetLife explaining that Broadbent suffered from a "multitude of significantly disabling conditions," including obesity, severe degenerative disk disease in her low back, fibromyalgia, and a total arthroplasty of her left hip. Doc. 31-2 at 61. Given these conditions, Dr. Hoversten "support[ed] that [Broadbent] be considered disabled for work activities in anything but the most sedentary positions." Doc. 31-2 at 61. In November 2009, Dr. David Ellerbusch, Broadbent's general practitioner, completed a form supporting Broadbent's Family and Medical Leave Act request in which he indicated that Broadbent's fibromyalgia rendered her incapable of doing her job and that this condition was permanent. Doc. 31-2 at 33–35.

Broadbent stopped working in December 2009 due to her health conditions. MetLife concluded that she was eligible for long-term disability benefits and began paying benefits effective March 2010. Doc. 31-2 at 2. Dr. Ellerbusch completed a MetLife physician questionnaire concerning Broadbent in August 2010. Doc. 31-2 at 36–37. He concluded that Broadbent could only stand, sit, and walk for one hour each day, and that she would never be

---

> Disabled" or "Total Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis, and during our Elimination Period, you are unable to perform your Own Occupation for any employer in your Local Economy.
> 2. after your Elimination Period and during the next 60 month period, you are unable to earn more than 80% of your Predisability Earnings at your Own Occupation for any employer in your Local Economy .
> . . .

Doc. 31-2 at 8.

2

capable of returning to work. Doc. 31-2 at 36–37. In February 2011, MetLife sent a letter to Suzanne Bakken, a nurse practitioner who treated Broadbent at the Sanford Pain Center, inquiring when Nurse Bakken thought Broadbent could return to work. Doc. 31-2 at 48. Nurse Bakken responded that Broadbent would not be a reliable employee even in a sedentary position and that although Broadbent was working hard to manage her pain, this was still a full-time job for her. Doc. 31-2 at 49.

On January 13, 2012, an administrative law judge concluded that Broadbent's degenerative disc disease, left total hip arthroplasty, fibromyalgia, and obesity rendered her disabled under the Social Security Act. Doc. 31-2 at 20–27. In April 2012, a medical director for MetLife conducted a review of Broadbent's records. Doc. 31-2 at 72–73. The medical director stated that Broadbent had traveled up to 1,000 miles to attend a craft event, that Broadbent's left hip appeared to be doing well, and that there was no evidence that a medical condition restricted her ability to work. Doc. 31-2 at 73. Dr. Hoversten completed a MetLife physician questionnaire concerning Broadbent in July 2012. Doc. 31-2 at 67–69. He wrote that Broadbent could sit continuously for four hours, stand for two hours, and walk for one hour. Doc. 31-2 at 67–68. Dr. Hoversten also concluded that Broadbent could work eight hours per day. Doc. 31-2 at 68.

In early November 2012, MetLife sent Broadbent a letter explaining that it was terminating her claim for long-term disability benefits because she no longer met the Plan's definition of disability. Doc. 31-2 at 4–7. The letter discussed the July 2012 questionnaire from Dr. Hoversten and the medical director's review of Broadbent's file before concluding that Broadbent's medical records did not "substantiate the presence of a continued physical or

psychiatric impairment that would prevent [Broadbent from] working." Doc. 31-2 at 5–6. Broadbent appealed MetLife's decision to terminate her benefits.

While this appeal was pending, Dr. Marc Sloan completed a physician consultant review for MetLife in late December 2012. Doc. 31-2 at 75–84. According to Dr. Sloan, Dr. Ellerbusch deferred to Dr. Hoversten concerning Broadbent's physical limitations but still believed that Broadbent's subjective symptoms rendered her incapable of working. Doc. 31-2 at 82. Dr. Sloan concluded that Broadbent's subjective pain complaints were inconsistent with her activities, including traveling to Utah, doing housework, mowing her mother's yard, and doing physical therapy. Doc. 31-2 at 82–83. He opined that the medical information supported Dr. Hoversten's conclusions in the July 2012 questionnaire that, in a given day, Broadbent could sit continuously for four hours, stand for two hours, walk for one hour, and work for eight hours. Doc. 31-2 at 83. In a January 16, 2013 addendum to his review of Broadbent's claim, Dr. Sloan reiterated that he agreed with the functional limitations set forth by Dr. Hoversten in the July 2012 questionnaire. Doc. 31-2 at 84. Based upon these limitations, Dr. Sloan believed that Broadbent was capable of working in a sedentary capacity for eight hours a day. Doc. 31-2 at 84.

On January 18, 2013, Broadbent sent a letter to MetLife explaining that her flight to Utah took quite a toll on her body and that although she used to mow her mother's yard two summers ago, she could no longer do so. Doc. 31-2 at 30. Four days later, Dr. Hoversten sent MetLife a letter stating: "Lynn Broadbent has severe back deterioration and a painful total hip on left. Since 2008 I have supported full disability for her. The workability report of 7-16-12 was only according to her fractured hand and wrist. It was never intended to retract her disability qualifications." Doc. 31-2 at 70.

4

On February 20, 2013, Dr. Sloan issued another addendum to his review of Broadbent's medical records. Doc. 31-2 at 85. Once again, Dr. Sloan stated that he agreed with the functional limitations outlined in Dr. Hoversten's July 2012 questionnaire. Doc. 31-2 at 85. He also opined that a ten to fifteen minute break with a change of position every two hours would allow Broadbent to sit for more than six hours during an eight hour work day. Doc. 31-2 at 85. Dr. Sloan did not mention Dr. Hoversten's recent letter stating that the July 2012 questionnaire only concerned Broadbent's hand and wrist. Doc. 31-2 at 85.

MetLife sent Broadbent a letter affirming the termination of her claim on February 25, 2013. Doc. 31-2 at 8–14. Consistent with Dr. Sloan's opinion and Dr. Hoversten's findings in the July 2012 questionnaire, MetLife concluded in the letter that Broadbent could work eight hours a day, including sitting continuously for four hours, standing for two hours, and walking for one hour. Doc. 31-2 at 13. MetLife acknowledged that Dr. Hoversten had since made clear that the July 2012 questionnaire only concerned Broadbent's wrist, but stated that "there were no additional clinical findings submitted for review." Doc. 31-2 at 12. MetLife ultimately found that Broadbent was not totally disabled under the Plan because her functional limitations did not preclude her from earning more than eighty percent of her pre-disability income as a treasury analyst. Doc. 31-2 at 13.

In July 2013, Broadbent sued the Plan under the Employee Retirement Income Security Act of 1974 (ERISA). Doc. 1. She claimed that she remained disabled under the Plan's definition and sought an award of long-term disability benefits. Doc. 1. The parties engaged in mediation before Magistrate Judge John Simko but could not reach a resolution. One month later, however, the parties filed a joint stipulation under which the Plan agreed to pay Broadbent past long-term

5

disability benefits and to reinstate her under the Plan subject to its terms and conditions. Docs. 26, 27. The parties agreed that the only remaining issue in this case was whether Broadbent is entitled to attorney's fees, costs and disbursements, and interest. Docs. 26, 27. Based upon the stipulation, the Court entered an order dismissing Broadbent's ERISA claim but retaining jurisdiction to decide the attorney's fees issue. Doc. 27.

Thereafter, Broadment filed a motion seeking $31,441.03 in attorney's fees and costs with a multiplier of 1.5 for a total of $46,954.40. Docs. 29, 30, 31. The Plan opposed Broadment's request, arguing that she is not entitled to attorney's fees because she failed to achieve some degree of success on the merits, that a fee award is not appropriate in this case, and that even if the Court decides to award attorney's fees, Broadbent's request is unreasonable. Doc. 32.

I.     **Achieving some degree of success on the merits**

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In Hardt v. Reliance Standard Life Insurance Co., 560 U.S. 242 (2010), the Supreme Court held that eligibility for an award under § 1132(g)(1) does not require that the fee-seeker be a prevailing party, but only that the "claimant . . . show 'some degree of success on the merits.'" Id. at 255 (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983)). Although a "trivial success" or a "purely procedural victor[y]" does not satisfy this standard, it is sufficient if "the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was substantial or occurred on a central issue.'" Id. at 255 (alterations in original) (quoting Ruckelshaus, 463 U.S. at 688 n.9) (internal quotation marks omitted).

Broadbent has achieved some degree of success on the merits such that the Court has discretion to award attorney's fees. Although Broadbent's success was not the result of a remand or a favorable decision on the merits, this fact does not, as the Plan suggests, preclude an award of attorney's fees. An award of attorney's fees in an ERISA case may be proper when a plaintiff's suit operated as a catalyst to bring about a voluntary change in the defendant's conduct. See Boyle v. Int'l Bhd. of Teamsters Local 863 Welfare Fund, 579 F. App'x 72, 77–78 (3d Cir. 2014); Burwitz v. Ulteig Eng'rs, Inc. Emp. Stock Ownership Plan, CIV 11-4175-LLP, Doc. 84 (D.S.D. Jan. 14, 2014). In Boyle, for instance, the Third Circuit applied the catalyst theory and concluded that the plaintiffs had achieved some success on the merits where the defendants voluntarily reinstated the plaintiffs' benefits but only after the plaintiffs filed suit. 579 F. App'x at 77–78. Likewise, this Court in Burwitz concluded that the plaintiffs had achieved some success on the merits because their suit operated as a catalyst to cause the defendants to make a lump sum payment of benefits. CIV 11-4175-LLP, Doc. 84 at 2–3. Here, Broadbent's suit served as a catalyst that caused the Plan to provide her with the relief she sought. After all, the Plan had an ample opportunity to award benefits at the administrative level but declined to do so until after Broadbent filed suit and the parties engaged in mediation.

Relying on the Eighth Circuit's decision in Deckard v. Interstate Bakeries Corp. (In re Interstate Bakeries Corp.), 704 F.3d 528 (8th Cir. 2013), the Plan argues that the Court should not apply the catalyst theory in this case. In Deckard, a former Interstate Bakeries' employee filed an administrative claim in the company's bankruptcy proceeding seeking reimbursement of his medical expenses and civil penalties for Interstate Bakeries' failure to provide certain notices under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). 704 F.3d at 533.

7

Interstate Bakeries voluntarily agreed to reimburse and reinstate the employee under its ERISA plan and did not dispute that it had failed to provide proper notice under COBRA. Id. Nevertheless, the bankruptcy court granted summary judgment to Interstate Bakeries on the employee's claim for civil penalties and denied his request for attorney's fees. Id. The employee argued on appeal that he was entitled to attorney's fees because he had obtained reimbursement and reinstatement under the plan and had demonstrated that Interstate Bakeries had failed to provide the requisite COBRA notices. Id. at 538. The Eighth Circuit disagreed, finding that the bankruptcy court's denial of attorney's fees was not an abuse of discretion because the employee had advanced "ludicrous" arguments during litigation and had failed to prevail on a single contested issue. Id.

Unlike the employee in Deckard, Broadbent did not fail to obtain a significant portion of the relief she requested in her complaint. Broadbent's complaint only sought recovery of long-term disability benefits under the Plan. She obtained this relief through the joint stipulation, under which the Plan agreed to pay Broadbent past long-term disability benefits and to reinstate her under the Plan. Docs. 26, 27. Courts faced with similar circumstances have held that the plaintiff achieved some degree of success on the merits. See Pierorazio v. Thalle Const. Co., No. 13 CV 4500(VB), 2014 WL 3887185, at *3 (S.D.N.Y. June 26, 2014) (concluding that plaintiff could "easily claim" some degree of success on the merits where he received through a settlement substantially all of the relief he sought in his complaint); Taaffe v. Life Ins. Co. of N. Am., 769 F. Supp. 2d 530, 540–42 (S.D.N.Y. 2011) (holding that plaintiff achieved "more than 'some success on the merits'" because the defendant provided her with everything she requested in her complaint); Hackett v. Standard Ins. Co., No. CIV. 06-5040-JLV, 2010 WL 5068098, at *3–4

(D.S.D. Dec. 7, 2010) (finding that settling plaintiff who obtained the long-term disability benefits sought in her complaint had achieved a "complete victory" and was entitled to attorney's fees). Because Broadbent obtained substantially all of the relief sought in her complaint, her case is more like Pierorazio, Taaffe, and Hackett than Deckard.

At bottom, Broadbent's suit served as a catalyst to cause the Plan to provide her with substantially all of the relief she sought in her complaint. This is sufficient to establish that Broadbent achieved some degree of success on the merits.

## II. Deciding whether a fee award is appropriate

If the fee claimant has achieved some degree of success on the merits, the Eighth Circuit has set forth a "nonexhaustive list of factors to consider" when deciding whether a fee award is appropriate. McDowell v. Price, 731 F.3d 775, 783 (8th Cir. 2013) (citing Lawrence v. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984) (per curiam)). These factors include:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal qeustion [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

Westerhaus, 749 F.2d at 496 (alteration in original) (quoting Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980)). Courts should not mechanically apply these five factors. Rather, "the district courts should use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." Martin v. Ark. Blue Cross & Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002) (en banc). Finally, "[a] district court considering a motion for attorney's fees under ERISA should . . . apply its discretion consistent with the

purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts." Starr v. Metro Sys., Inc., 461 F.3d 1036, 1040 (8th Cir. 2006) (quoting Welsh v. Burlington N., Inc., Emp. Benefits Plan, 54 F.3d 1331, 1342 (8th Cir. 1995)).

The Court begins its analysis with the fifth Westerhaus factor, the relative merits of the parties' positions. Broadbent argues that the Plan erred by reversing its prior award of benefits when there was no evidence that her condition had improved. Absent a significant change in the information available to it, a plan administrator's "previous payment of benefits is a circumstance that must weigh against the propriety of an [administrator's] decision to discontinue those payments." McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002). Here, MetLife treated Dr. Hoversten's July 2012 questionnaire as a significant change in the evidence concerning Broadbent's physical condition. Indeed, MetLife's decision to uphold the termination of Broadbent's claim for long-term disability benefits relied in large part on the July 2012 questionnaire and Dr. Sloan's agreement with the statements therein. MetLife adopted the conclusions in the July 2012 questionnaire concerning Broadbent's capacity to sit, stand, walk, and work, and found that Broadbent was not totally disabled under the Plan because her capacity to engage in these activities allowed her to earn more than eighty percent of her pre-disability earnings as a treasury analyst. Doc. 31-2 at 13. By the time MetLife issued its decision on Broadbent's appeal, however, Dr. Hoversten had informed MetLife that the July 2012 questionnaire only concerned Broadbent's wrist, that the questionnaire was not meant to retract Broadbent's disability qualifications, and that Broadbent still had severe back deterioration and a painful total hip on her left. Doc. 31-2 at 70. This clarification not only established that the questionnaire was weak evidence of Broadbent's overall capacity, but also cast doubt on Dr.

10

Sloan's conclusions, which relied heavily on the questionnaire. Putting aside the 2012 questionnaire and Dr. Sloan's conclusions, there was little evidence that Broadbent's physical condition had improved since March 2010 when the Plan determined that she was disabled. Nor was there a significant change in the evidence concerning Broadbent's condition in March 2010 such that the Plan would be justified in finding that its initial disability determination was incorrect. Although the early termination of this litigation makes it difficult to fully compare the merits of the parties' positions, the Plan's previous payment of benefits weighs against its decision to terminate those benefits, and gives Broadbent an edge on the fifth Westerhaus factor.

The record, while not establishing bad faith, supports a finding that the Plan is culpable to some limited degree in its failure to properly consider the evidence. After all, the Plan reversed its prior award of benefits to Broadbent despite a paucity of evidence that her condition had improved. In doing so, the Plan ignored Dr. Hoversten's statement that the 2012 questionnaire was not an accurate representation of Broadbent's overall capacity and that he still supported her claim for full disability. Because the Plan both determines a claimant's eligibility for and pays benefits, its conduct in terminating Broadbent's long-term disability benefits is particularly concerning. See Brake v. Hutchinson Tech. Inc. Grp. Disability Income Ins. Plan, 774 F.3d 1193, 1196 (8th Cir. 2014) (noting that there is an inherent financial conflict of interest where a party is both the insurer and the administrator of a plan).

The second Westerhaus factor—the parties' ability to satisfy an award of attorney's fees—weighs in Broadbent's favor as the Plan agrees that it could pay any such award. The third Westerhaus factor concerns whether an award of attorney's fees would deter other persons acting under similar circumstances. The Court finds that an award of attorney's fees in this case would

11

deter claims fiduciaries from terminating an award of benefits without carefully weighing the evidence. The third Westerhaus factor thus weighs in Broadbent's favor. The fourth Westerhaus factor—whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question—militates against an award of attorney's fees. Broadbent's case does not involve a significant legal issue and she only sought benefits for herself. Nevertheless, the majority of the Westerhaus factors favor an award of attorney's fees. The Court finds that an award of attorney's fees in this case is appropriate and consistent with the purposes of ERISA.

**III. Determining the amount of attorney's fees to award Broadbent**

The starting point for determining the appropriate amount of attorney's fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). In determining the lodestar, Courts may consider such factors as:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee was fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. at 430 n.3. A court is not required to "examine exhaustively and explicitly . . . all of the factors that are relevant to the amount of a fee award." Griffin v. Jim Jamison, Inc., 188 F.3d 996, 997 (8th Cir. 1999).

Broadbent seeks $31,441.03 in attorney's fees and costs with a multiplier of 1.5 for a total of $46,954.40. Docs. 29, 30, 31. The $31,441.03 reflects the work performed by Broadbent's attorney Dean Nasser and Nasser's paralegal. Doc. 29-1. Nasser and his paralegal performed 125.85 hours of work with Nasser billing at a rate of $250.00 per hour. Doc. 29-1. Although the Plan objects to any award, it does not express any objection to Nasser's hourly rate. Nasser filed a declaration that outlines his experience representing ERISA plaintiffs and sets forth the hourly rate charged by other attorneys engaged in similar practice. Docs. 29, 29-2, 29-3, 29-4. Given Nasser's experience, the prevailing market rate in South Dakota, and the lack of any objection from the Plan, the Court finds that Nasser's hourly rate is reasonable.

The Plan argues that the 52.1 hours Nasser spent reviewing Broadbent's file at the beginning of the case and in connection with the parties' mediation should be discounted by seventy-five percent as duplicative and unreasonable. Nasser spent fourteen hours reviewing Broadbent's file in May and July of 2013. Doc. 29-1. In January 2014, Nasser spent sixteen hours reviewing the administrative claim file he received from the Plan. Doc. 29-1. The administrative record file was longer than Broadbent's file and had to be compared. Nasser then spent 22.1 hours in June 2014 preparing for the mediation, including reviewing Broadbent's file, researching, and drafting a mediation statement. Doc. 29-1. Broadbent asserts in her affidavit that the time Nasser spent reviewing her file and preparing for the mediation was justified because the administrative record was 1,900 pages and because Nasser took great care in preparing the mediation statement so that it could be used for a later motion for summary judgment.

Having carefully reviewed the record, the Court concludes that the 52.1 hours Nasser spent reviewing the record and preparing for the mediation is certainly painstaking work but was

warranted and will not be reduced. The case did not involve any complex legal issues. Rather, the main issue in this case was whether Broadbent's condition had improved since March 2010 such that the Plan was justified in terminating her claim for benefits. The administrative record was voluminous and the facts had to be carefully reviewed to see that they supported Broadbent's claim in mediation. Moreover, Broadbent asserts that Nasser spent some of the 52.1 hours "fine-tun[ing] the case analysis" in the mediation statement so that it could be used as a motion for summary judgment. Doc. 31 at 6. In sum, Broadbent has demonstrated that the 52.1 hours Nasser spent reviewing the file and preparing for the mediation was reasonable. See Greater St. Louis Const. Laborers Welfare Fund v. A.L.L. Const., LLC, No. 4:12-CV-1511 CAS, 2014 WL 1648731, at *6 (E.D. Mo. Apr. 23, 2014) (noting that moving party bears burden of demonstrating that fee request is reasonable in ERISA case).

The Plan argues also that the time Nasser spent preparing the motion for attorney's fees was duplicative and should be discounted by a minimum of 50%. The Court agrees. Nasser spent 11.6 hours preparing Broadbent's affidavit and motion for attorney's fees, a memorandum in support of Broadbent's motion, and his own declaration. Doc. 29-1. The affidavit and motion for attorney's fees consisted mainly of a summary of Broadbent's medical history. Doc. 31. This summary should not have required extensive work given Nasser's previous review of Broadbent's file and preparation of a mediation statement. As for Broadbent's memorandum in support of her motion for attorney's fees, this document was modest in length and contained little analysis. Doc. 30. Under these circumstances, a 50% reduction of the 11.6 hours Nasser spent in connection with the attorney's fees issue is appropriate.

The legal assistant charges of $125 an hour are reduced to $100 an hour to be more in keeping with local rates.

Finally, the Plan objects to Broadbent's request for a multiplier. To receive an enhancement of the lodestar, a fee applicant must offer "specific evidence demonstrating not only that outstanding service was rendered and an excellent result achieved, but also that both the service and the result were 'superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended.'" Emmengger v. Bull Moose Tube Co., 33 F. Supp. 2d 1127, 1140 (E.D. Mo. 1998) (quoting P.A. Novelly v. Palans (In re Apex Oil Co.), 960 F.2d 728, 732 (8th Cir. 1992)). Although Nasser achieved a favorable result for Broadbent, it was a superior result considering the hourly rate charged and number of hours expended. What more could the plaintiff have recovered? However, there is also the consideration that the hourly rate charged and allowed is modest for a trial lawyer with the experience of plaintiff's counsel. In addition, few lawyers in this geographic area take ERISA cases. Finally there is the consideration that there was the risk of non-recovery in this as in all ERISA cases. Even if there is some success in an ERISA case, that does not assure an award of attorney's fees. The enhancement will be 1.25, not 1.5, principally because the case was not legally complex. The fee agreement, Doc. 31-1, provides for a fee of one-third of all benefits recovered. The past and future benefits recovered were approximately $170,000. Given these considerations, the Court will award a multiplier of 1.25, not the 1.5 requested. The Court finds that Broadbent has demonstrated that Nasser's work warrants an enhancement. However, this enhancement will not apply to work performed by Nasser's legal assistant or other attorneys at his firm.

The above reductions to Nasser's hours and the enhancement result in a total fees and costs award of $37,581.75. Based upon the Court's review of the record, its knowledge of the legal market, and the relevant case law, this amount reasonably compensates Nasser for the successful result he obtained in what amounted to a relatively uncomplicated ERISA case.

## IV. Conclusion

For the reasons stated above,

IT IS ORDERED:

That Broadbent's motion for attorney's fees and costs (Doc. 31) is granted to the extent set forth in this Order, specifically, attorney's fees and costs for Nasser of $37,581.75.

Dated this 16th day of March, 2015.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, Clerk
By _____
Deputy